No. 50,714

STATE OF KANSAS, *Appellee,* v. RONALD A. PEOPLES, *Appellant.*

(605 P.2d 135)

Opinion filed January 19, 1980.

*James W. Wilson,* of Wichita, argued the cause and was on the brief for the appellant.

*Roger C. Skinner,* assistant district attorney, argued the cause, and *Robert T. Stephan,* attorney general, and *Vern Miller,* district attorney, were with him on the brief for the appellee.

The opinion of the court was delivered by

SCHROEDER, C.J.: This is an appeal in a criminal action from a jury verdict which found Ronald A. Peoples (defendant-appellant) guilty of felony murder (K.S.A. 21-3401), aggravated kidnapping (K.S.A. 21-3421), and rape (K.S.A. 21-3502). The appellant asserts several errors on appeal.

On September 14, 1977, the appellant and Richard Reck spent the evening together drinking beer. They began drinking at Reck's apartment shortly after Reck got off work at 8 o'clock; they went to a local tavern about 9 o'clock.

Reck shared the apartment, No. 414, at 1845 S. Hydraulic, Wichita, with his girl friend Carla Perkins. During the course of the evening Reck mentioned to the appellant that he and Carla

were breaking up and she was moving out by the end of the month. The appellant told Reck that he would take over where Reck left off; Reck told the appellant to stay away from Carla because she did not like him.

While the two men drank several beers at the tavern, the appellant suggested he could find a female companion with whom they could have sexual relations. The appellant called the woman and the two men picked her up. After purchasing more beer the trio proceeded to Wichita Pump and Insulation Company, Reck's place of employment. The appellant and the female companion engaged in sexual intercourse in one part of the building while Reck drank beer and did paper work at his desk. They left around 12:30 a.m. and returned to the parking lot outside Reck's apartment. Upon arriving at the apartment complex, the woman and Reck exited the appellant's car and entered Reck's car. The appellant was driving a light-colored 1966 Ford station wagon. Reck and the woman watched the appellant drive north away from the apartments; they estimated this occurred between 12:30 and 1:00 a.m. Reck remained with the woman, going to her house, then returning to Wichita Pump and Insulation Company, and finally taking her to work at a donut shop around 2:15 a.m. Reck then returned to his apartment.

Meanwhile, about 1:00 a.m. Michael Cote arrived home after work. Cote and his wife lived in apartment No. 413, directly below the apartment shared by Reck and Carla Perkins. Shortly after entering his apartment Cote heard someone walk up the stairs outside his apartment and knock on the door of Reck's apartment. Cote heard someone walk to the door and open it. Cote then heard a muffled scream, the door slam shut, and "a bunch of noises." Cote heard pounding on the floor and sounds of things being moved or shoved around. The sound continued for about ten minutes, then stopped for about five minutes, then started again. Cote was about to call the police when the noise stopped again and he heard the door of Reck's apartment open. Cote looked out his apartment window, which provided a shadowy view of the stairs descending from the above apartment. Cote saw a person take two steps on the stairs, and observed a pair of arms dangling beside the legs of the person walking down the stairs. He knew someone was being carried down the stairs. Cote testified that the person whose legs he saw was wearing pointed-toe

black boots and dark gray slacks. While Cote was looking out the window his wife called the police. Cote talked to the police for about two minutes and returned to the window. On the parking lot he observed the lights go on, then off, in a light-colored station wagon. He saw only the back half of the car, but noticed it had vertical tail lights. He observed the car back out of the parking lot and drive south. Cote testified the car was the same as the one depicted in photographs at trial—the appellant's car. Cote estimated all of this occurred between 1:00 and 1:30 a.m.

At approximately 2:30 a.m. Reck returned to the apartment and immediately noticed something was unusual. The lights were on, Carla's panties were by the T.V., the couch had a broken leg, a lamp was tipped over, and cards were on the floor. When he had left earlier that evening the apartment was neat, clean, and orderly, and the lights were turned off. He stepped outside the apartment and was confronted by the police. Reck denied any knowledge of what had occurred and voluntarily gave statements to the police.

On his way to work at 5:30 a.m. September 15, 1977, Leo Engels discovered Carla Perkins' nude body lying on the side of a county road. Engels determined that Carla was still alive and immediately sought police and ambulance assistance. Carla was taken to a hospital where she remained comatose for six days until her death on September 21, 1977.

The Wichita police gathered evidence at the scene where Carla was found. A lab investigator took photographs and plaster casts of a tire track that appeared to run across Carla's chest and lower neck. The police collected dirt samples from the tire track area and from a grassy area adjacent to the road. At the hospital, hairs were removed from Carla's head and a modified rape kit examination was performed. Photographs were taken of Carla's body, showing tire tracks on her chest and neck, and bite marks on her left breast.

The appellant was arrested the same morning Carla was found. A police investigator removed hair and dirt samples from the interior of the appellant's car; the tires were also removed from the car. The appellant's clothing was taken from him that morning; hair samples were removed from his shirt. Pursuant to court order, dental casts were made of the appellant's teeth.

At trial, both the appellant and the State presented comparison

evidence and expert testimony on the tire tracks, hair samples, rape examination, dirt samples, the appellant's clothing and dental impressions, and the bite marks on Carla's breast. This evidence will be further examined later in the opinion.

The jury heard testimony from all the persons involved the night in question, except the appellant and Carla Perkins. The State also presented testimony of Richard Jones, a young man who knew the appellant in junior high school and shared a jail cell with the appellant after the arrest on September 15, 1977. Jones testified that he and the appellant had conversations when they shared jail cells. During one of the conversations the appellant stated that he raped Carla Perkins, knocked her out of the car, and then ran over her. In later conversations the appellant expressed concern that Carla was in critical condition and could die; he didn't want to be charged with murder.

The jury returned guilty verdicts on felony murder, aggravated kidnapping, and rape. Appeal was duly perfected.

The appellant complains concerning the admission of opinion evidence of Dr. Thomas Krauss, a forensic odontologist. The appellant argues that bite-mark identification is a fledgling area of expertise which lacks reliability and the trial court erred in admitting the evidence.

The admissibility of expert testimony on bite-mark identification is a matter of first impression in Kansas. The requisites for admission of expert testimony were discussed in *Plains Transp. of Kan., Inc. v. King,* 224 Kan. 17, 21, 578 P.2d 1095 (1978), wherein this court stated:

"The purpose of an expert witness is to aid the jury in the interpretation of technical facts or to assist in understanding the material in evidence. (*Staudinger v. Sooner Pipe & Supply Corporation,* 208 Kan. 100, 105, 490 P.2d 619 [1971].) The witness must have skill or experience in the business or profession to which the subject relates. He must be qualified to impart knowledge within the scope of his special skill and experience that is otherwise unavailable to the jury. (*State v. McClain,* 216 Kan. 602, 606, 533 P.2d 1277 [1975]; *Grohusky v. Atlas Assurance Co.,* 195 Kan. 626, 630, 408 P.2d 697 [1965].)

"The introduction of opinion or expert testimony is controlled by K.S.A. 60-456. An expert must base his testimony upon facts personally perceived by or known to him or made known to him at the hearing. 'Perceived' means knowledge acquired through one's own senses. (K.S.A. 60-459[c].) 'Made known' refers to facts put into evidence. (*Ziegler v. Crofoot,* 213 Kan. 480, 484, 516 P.2d 954 [1973]; *Trimble, Administrator v. Coleman Co., Inc.,* 200 Kan. 350, 356, 437 P.2d 219 [1968]; *Casey v. Phillips Pipeline Co.,* 199 Kan. 538, 546, 431 P.2d 518 [1967].) The qualifications of an expert witness and the admissibility of his testimony are

within the sound discretion of the trial judge. (*State v. McClain,* supra; *Hagood v. Hall,* 211 Kan. 46, 51-52, 505 P.2d 736 [1973]; *American Family Mutual Ins. Co. v. Grim,* 201 Kan. 340, 344, 440 P.2d 621 [1968]; *Taylor v. Maxwell,* 197 Kan. 509, 419 P.2d 822 [1966].) When the trial court admits the testimony it is deemed to have made the findings requisite to its admission. (K.S.A. 60-456[*c*]; *State v. McClain,* supra; *Hagood v. Hall,* supra; *Taylor v. Maxwell,* supra.) At that point the weight of such testimony is a matter of consideration for the trier of fact."

Other jurisdictions which have considered this issue have unanimously recognized the validity and approved the admission of bite-mark identification evidence. See *People v. Slone,* 76 Cal. App. 3d 611, 143 Cal. Rptr. 61 (1978); *People v. Watson,* 75 Cal. App. 3d 384, 142 Cal. Rptr. 134 (1977); *People v. Marx,* 54 Cal. App. 3d 100, 126 Cal. Rptr. 350 (1975); *People v. Milone,* 43 Ill. App. 3d 385, 356 N.E.2d 1350 (1976); *People v. Johnson,* 8 Ill. App. 3d 457, 289 N.E.2d 722 (1972); *Niehaus v. State,* 265 Ind. 655, 359 N.E.2d 513, *cert. denied* 434 U.S. 902 (1977); *State v. Routh,* 30 Or. App. 901, 568 P.2d 704 (1977); *Patterson v. State,* 509 S.W.2d 857 (Tex. 1974).

The California courts have admitted bite-mark identification evidence after a two-step determination of the reliability of this new scientific technique and the qualifications of the expert witness. In *People v. Slone,* 76 Cal. App. 3d at 624, the court stated:

"The superior trustworthiness of the scientific bite mark approach . . . is due to the fact that the trier of fact could see for itself, by looking at the material-object exhibits of slides, photographs, X-rays and models of the victim's bite-mark wounds, what constituted the basis for comparison with a defendant's dentition. . . . [T]he [dental] experts 'did not rely on untested methods, unproven hypotheses, intuition or revelation. Rather, they applied scientifically and professionally established techniques . . . to the solution of a particular problem which, though novel, was well within the capability of those techniques.' " [Quoting *People v. Marx,* 54 Cal. App. 3d at 111.]

The Indiana Supreme Court in *Niehaus v. State,* 265 Ind. at 661, distinguished bite-mark identification from polygraph test results and stated:

"The method of identification utilized here, however, is simply a matter of comparison of items of physical evidence to determine if they are reciprocal. The methods for making such comparisons are indeed complex and require skilled technicians to perform, but they consist of standardized procedures known to procure accurate models and measurements. We see no reason why such evidence should be rejected as unreliable, simply because it has thus far had limited application."

We think bite-mark identification by an expert witness is sufficiently reliable and can be a valuable aid to a jury in understanding and interpreting evidence in a criminal case. When the witness has the requisite skill and experience, and demonstrates the accuracy and reliability of his models, photographs, X-rays and supporting exhibits in bite-mark identification, the trial court in the exercise of its power of discretion may properly admit the opinion testimony of the expert witness.

The appellant also challenges the admission of Dr. Krauss' opinion testimony, claiming that an inadequate foundation was presented to qualify Dr. Krauss as an expert, and that the exhibits and models were inaccurate.

Dr. Krauss described himself as a general dentist, specializing in forensic odontology. He was a 1955 graduate of Northwestern University, and served five years in the military before entering private practice. He is a certified diplomat of the American Board of Forensic Odontologists, a fellow in the American Academy of Forensic Sciences, and a member of the American Society of Forensic Odontology. He teaches forensic odontology to senior students and provides continuing education courses for graduate dentists at the University of Colorado School of Dentistry. Dr. Krauss has been a consultant for various law enforcement agencies, including the Kansas and Colorado Bureaus of Investigation. He has attended many lectures and seminars on forensic odontology and is acquainted with the major literature and experts in the field of bite-mark identification.

Dr. Krauss testified at length about the various procedures and practices underlying bite-mark identification. The testimony spans more than 150 pages in the record. He discussed the manner of comparing dental casts, wax impressions, and photographs. He also testified to the numerous factors that are considered in bite-mark identification. In comparing the appellant's dentition with the bite marks on Carla's breast, Dr. Krauss used casts and photos of the appellant's teeth and compared those to the bite marks shown in the photographs of the victim. Dr. Krauss also used several photographic enlargements of the bite marks, the cast of the appellant's teeth, and the wax imprints to illustrate the many shared characteristics of the teeth and the bite marks. All of these exhibits and models were admitted into evidence. After explaining the procedure he used to develop the exhibits

and identify the many important points of comparison, Dr. Krauss gave his opinion. He testified that in his opinion it was highly probable that the appellant had bitten the left breast of Carla Perkins.

After carefully reviewing the detailed testimony of Dr. Krauss, we find no error in the trial court's admission of his testimony. Dr. Krauss was sufficiently qualified to be an expert witness and provided an adequate foundation for his testimony. He was shown to have special skill and expertise in the field of forensic odontology, and was qualified to impart this otherwise unavailable knowledge to the jury. See *Plains Transp. of Kan., Inc. v. King,* 224 Kan. at 21.

The appellant specifically challenges the use and admission of a set of dental casts and several enlarged photographs. Dr. Krauss testified to the origin and production of those exhibits and stated he found them reliable and acceptable for his use. The trial court did not abuse its discretion in admitting those exhibits. Any discrepancies go to the weight of that evidence, and the testimony based upon it, and are properly a matter for the jury. See *Plains Transp. of Kan., Inc. v. King,* 224 Kan. at 21; *Borth v. Borth,* 221 Kan. 494, 498, 561 P.2d 408 (1977); *Hildebrand v. Mueller,* 202 Kan. 506, 509, 449 P.2d 587 (1969).

The appellant next contends that there was insufficient evidence to support the convictions.

In a criminal action where the defendant contends the evidence at trial was insufficient to sustain a conviction, the standard of review on appeal is: Does the evidence when viewed in the light most favorable to the prosecution convince the appellate court that a rational factfinder could have found the defendant guilty beyond a reasonable doubt? *State v. McGhee,* 226 Kan. 698, 602 P.2d 1339 (1979); *State v. Voiles,* 226 Kan. 469, 601 P.2d 1121 (1979). In considering the sufficiency of evidence to sustain a conviction, this court looks only to the evidence in favor of the verdict, it does not weigh the evidence and if the essential elements of the charge are sustained by any competent evidence the conviction must stand. *State v. Racey,* 225 Kan. 404, Syl. ¶ 3, 590 P.2d 1064 (1979). A careful review of the record shows the Wichita Police Department conducted a thorough investigation and the State presented sufficient competent evidence to support the verdict of the jury.

Michael Cote testified that he overheard a struggle and saw a man carrying a body down the stairs. Cote saw a light-colored station wagon with vertical tail lights leave the apartment complex. At trial, Cote identified the appellant's car as the one he saw that night. The police photographed the impressions of tire treads on the victim's body and compared them to a tire removed from the appellant's car. Richard Cook, a police lab technician, testified that his comparison found nothing to exclude the appellant's tire from having made the impression. Cook observed the same tread design in both the appellant's tire and the photograph of the tire tread impression taken at the scene where the victim was found.

The State also presented evidence of microscopic comparisons of hair samples found on the appellant's shirt and hair taken from the victim's head. One of the hairs removed from the appellant's shirt displayed the same microscopic characteristics as the hair from the victim's head. A modified rape kit examination was performed on the victim the morning she was found. Chemical tests indicated the presence of acid phosphatase, a substance found in seminal fluid. Human blood was found on the front of the appellant's undershorts and in the fly area of his blue jeans. Insufficient quantities were available to determine whether the blood was menstrual. A soiled sanitary napkin was found in the dining room of the victim's apartment. The State presented the testimony of Gerard James, head of the Geochemistry Section of the Kansas Geological Survey. Mr. James compared dirt samples taken from the area where the victim was found and samples taken from the floorboard of the appellant's car. James explained the three tests he performed and testified all samples had virtually the same composition and characteristics.

The State presented the expert testimony of Dr. Krauss that it was highly probable the appellant bit the victim's left breast. Richard Jones testified concerning the appellant's statement that he raped Carla Perkins, knocked her out of the car and ran over her. The appellant's extrajudicial admission carries significant weight. There was no challenge to the voluntariness of the admission, and Jones' credibility, though not shown to be impaired, was for the jury to determine.

We are convinced that based upon this evidence a rational factfinder could have found the appellant guilty beyond a reasonable doubt.

The appellant contends the trial court erred in failing to give an instruction on circumstantial evidence. We held in *State v. Wilkins,* 215 Kan. 145, 156, 523 P.2d 728 (1974), that instructions on circumstantial evidence are not necessary, stating:

"The probative values of direct and circumstantial evidence are intrinsically similar and there is no logically sound reason for drawing a distinction as to the weight to be assigned to each. We believe that whatever type of evidence is introduced in a criminal trial (whether it be termed direct, indirect, testimonial, circumstantial or a combination) the trier of fact must apply the same test to convict the defendant and if there is a reasonable doubt as to his guilt then the defendant should not be found guilty. This court now feels it is time to discard our former rule requiring a circumstantial evidence instruction to be given.

"A proper instruction on 'reasonable doubt' as applied to all kinds of evidence gives the jury an appropriate standard upon which to make a determination of guilt or innocence; to instruct further on the probative force of circumstantial evidence is to invite the confusion of semantics; and we disapprove statements to the contrary found in *State v. Skinner,* 210 Kan. 354, 362, 503 P.2d 168, *State v. Hale,* 207 Kan. 446, 450, 485 P.2d 1338, and in any other decision of this court contra to our holding in the instant case.

"We hold an instruction on circumstantial evidence, which cautions the jury that a defendant should not be found guilty unless the facts and circumstances proved exclude every reasonable theory of innocence or states that the jury cannot convict the defendant on circumstantial evidence unless the circumstances exclude every reasonable hypothesis of his innocence, is unnecessary when a proper instruction on 'reasonable doubt' is given; and we overrule *State v. White,* 211 Kan. 862, 508 P.2d 842, and all other decisions in which this court has required a special instruction on circumstantial evidence."

The trial court did not err in failing to give an instruction on circumstantial evidence. The appellant had an opportunity in closing argument to impress the jury with the circumstantial nature of most of the evidence.

The appellant next contends the trial court erred in failing to properly instruct the jury on his theory of defense. The appellant's theory of defense was that the State could not prove guilt beyond a reasonable doubt. The appellant argues the trial court should have included a statement on reasonable doubt in each of the four instructions which stated the elements of the offenses. The appellant also claims the trial court erred in failing to give a converse charge instruction similar to the instruction we approved in *State v. Johnson,* 222 Kan. 465, 476, 565 P.2d 993 (1977); *State v. Reed,* 213 Kan. 557, 562-63, 516 P.2d 913 (1973); *State v. Potts,* 205 Kan. 42, 45, 468 P.2d 74 (1970); and *State v.*

*Runnels,* 203 Kan. 513, 456 P.2d 16 (1969). The trial court gave an instruction on reasonable doubt which substantially conformed with PIK Criminal 52.02. Indeed, the trial court modified the first sentence of the PIK instruction to emphasize reasonable doubt. It was not error for the court to refuse to add the words "reasonable doubt" to each of the instructions which set forth the elements of the offenses. When the instructions are considered as a whole, the jury was adequately apprised of the State's burden of proof. See *State v. Stewardson,* 121 Kan. 514, 247 Pac. 429 (1926); *State v. McDonald,* 107 Kan. 568, 572, 193 Pac. 179 (1920). "Error cannot be predicated on the refusal to give specific instructions where those which were given cover and include the substance of those refused." *State v. Wilson,* 221 Kan. 92, Syl. ¶ 3, 558 P.2d 141 (1976); *State v. Taylor,* 212 Kan. 780, Syl. ¶ 2, 512 P.2d 449 (1973).

Finally, the appellant contends the cumulative trial errors merit reversal. This contention has no merit.

Judgment of the lower court is affirmed.